ROBINS KAPLAN LLP
David B. Shemano (State Bar No. 176020)
dshemano@robinskaplan.com
James P. Menton, Jr. (State Bar No. 159032)
jmenton@robinskaplan.com
2049 Century Park East, Suite 3400
Los Angeles, CA  90067
Telephone: 310-552-0130
Facsimile: 310-229-5800

Special Litigation Counsel for Alfred H. Siegel,
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.  2:11-bk-62283-BB |
| GENIUS PRODUCTS, LLC, | Chapter 7 |
| Debtor. | |
| | |
| ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE FOR THE ESTATE OF GENIUS PRODUCTS, LLC, | Adv. No. 2:14-ap-01287-BB |
| Plaintiff, | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | [Declaration of James P.  Menton, Jr. Filed Concurrently Herewith] |
| TREVOR DRINKWATER, | |
| Defendant. | Date:  November 1, 2016 |
| | Time: 2:00 p.m. |
| | Place: Courtroom 1539 |
| | United States Bankruptcy Court |
| | 255 E. Temple Street |
| | Los Angeles, CA 90012 |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61245645.1

**TO THE UNITED STATES BANKRUPTCY COURT, THE UNITED STATES TRUSTEE, DEFENDANT AND HIS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on November 1, 2016, at 2:00 p.m. or as soon thereafter as the matter may be heard, in Courtroom 1539 of the above-captioned Court (the "Court"), located at 255 East Temple Street, Los Angeles, CA 90012, Plaintiff Alfred H. Siegel (the "Trustee"), chapter 7 trustee for the estate of Genius Products, LLC (the "Debtor"), will and hereby does move this Court pursuant to Federal Rule of Civil Procedure 15(a), made applicable herein by Federal Rule of Bankruptcy Procedure Rule 7015, for an order authorizing the Trustee to file the amended complaint attached hereto as Exhibit A (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of James P. Menton, Jr. filed concurrently herewith, the files, records, pleadings and papers in this adversary proceeding and in the Debtor's bankruptcy case, any reply papers that may be filed in connection with this Motion and upon such other evidence and argument as may be presented at or before the hearing of this Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), a written response to this Motion must be filed and served on counsel for the Trustee and on the United States Trustee at least fourteen (14) days before the hearing on the Motion.  Pursuant to Local Bankruptcy Rule 9013-1(h), failure to file and serve timely a response in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy Court to be consent to the granting of the relief requested in the Motion.

DATED: October 11, 2016                    **ROBINS KAPLAN LLP**


By:  /s/ James P. Menton, Jr.
      David B. Shemano
      James P. Menton, Jr.

Special Litigation Counsel for Alfred H. Siegel, Chapter 7 Trustee

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 2

    A.  Involuntary Petition And Order For Relief ................................................ 2

    B.  The Complaints Filed Against Mr. Drinkwater And Weinstein ................ 3

    C.  The Trustee Files A Motion To Compel Mr. Drinkwater To Perform Duties
        As The Debtor's Representatives And Motion To Modify Scheduling
        Order ........................................................................................................ 5

    D.  Scheduling Conference in Drinkwater Action ......................................... 6

    E.  The Trustee Obtains Debtor Records And Takes 2004 Examination Of Mr.
        Drinkwater ............................................................................................... 7

    F.  Status of the Drinkwater Action ............................................................... 9

III. ARGUMENT ...................................................................................................... 9

    A.  The Court Should Grant Leave To Amend Under Rule 15 ....................... 9

    B.  The Proposed Amended Complaint Relates Back Under Rule 15 .......... 11

IV. CONCLUSION ................................................................................................. 13

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asacrco, LLC v. Union Pac. R.R. Co.*,
    765 F.3d 999 (9th Cir. 2014)..................................................................11

*DCD Programs, Ltd. V. Leighton*,
    833 F.2d 183 (9th Cir. 1987)..................................................................10

*Eminence Capital, LLC v. Aspeon*,
    316 F.3d 1048 (9th Cir. 2003)..............................................................2, 9

*Foman v. David*,
    371 U.S. 178, 83 S. Ct. 227 (1962).......................................................9, 10

*Gerritsen v. Warner Bros. Entm't Inc.*,
    112 F. Supp.3d 1011 (C.D. Cal. 2015) .....................................................3

*Howey v. United States*,
    481 F.2d 1187 (9th Cir. 1973).............................................................9, 10

*In re Linda Vista Cinemas, L.L.C.*,
    442 B.R. 724 (Bankr. D. Ariz. 2010) ........................................................3

*Martell v. Trilogy, Ltd.*,
    872 F.2d 322 (9th Cir. 1989)..............................................................11, 12

*Moore v. Kayport Package Express, Inc*,
    885 F.2d 531 (9th Cir. 1989)....................................................................9

*NovelPoster v. Javitch Canfield Group*,
    140 F. Supp.3d 954 (N.D. Cal. 2014) ........................................................3

*Nunes v. Ashcroft*,
    375 F.3d 805 (9th Cir. 2003)................................................................2, 9

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*
    442 F.3d 741 (9th Cir. 2006).....................................................................3

*Sweaney v. Ada County, Idaho*,
    119 F.3d 1385 (9th Cir. 1997)..................................................................11

*U.S. v. Hicks*,
    283 F.3d 380 (D.C. Cir. 2002) .................................................................12

-ii-

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**Statutes**

11 U.S. Code § 546(a)................................................................................................1

11 U.S. Code Chapter 7............................................................................................2

Bankr. Code  341(a)..................................................................................................3

Bankr. Code 521(a)(1)..............................................................................................3

Bankr. Code 521(a)(4)..............................................................................................3

Bankr. Code 544(b)..............................................................................................2, 13

Bankr. Code 548.....................................................................................................13

**Rules**

Fed. R. Bankr. P.  15(c)(1)(B)..................................................................................11

Fed. R. Bankr. P. 2004.............................................................................................6

Fed. R. Bankr. P. 4002(a)(1).....................................................................................6

Fed. R. Bankr. P. 7015.............................................................................................9

Fed. R. Civ. P. 15.........................................................................................2, 9, 11, 12

Fed. R. Civ. P. 15(a)................................................................................................9

Fed. R. Civ. P. 7015................................................................................................2

Fed. R. Evid. 201(b).................................................................................................3

Fed. R. Evid. 201(d)................................................................................................3

Rule 26(f)..............................................................................................................9

**Other Authorities**

6A Miller, Federal Practice and Procedure, § 1497 (West 2010)..................................12

1                **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **I.**    **INTRODUCTION**

3       Defendant Trevor Drinkwater ("Drinkwater") served as the Chief Executive Officer of

4 Genius Products, LLC (the "Debtor") the entire time the Debtor was an operating company.

5 During that time, Mr. Drinkwater used his control as insider to cause the transfer of Debtor funds

6 in excess of $130 million to insiders to the detriment of non-insider creditors. In doing so, Mr.

7 Drinkwater placed his own interests ahead of the Debtor's interests and breached his fiduciary

8 duties owed to the Debtor. Further, after the Debtor was forced into bankruptcy and the Trustee

9 appointed, Mr. Drinkwater failed to cooperate with the Trustee, including failing to turn over the

10 Debtor's books and records that he controlled.

11       Prior to the expiration of the section 546(a) statute of limitations, based on the very

12 limited information the Trustee had at the time, the Trustee filed a complaint against Mr.

13 Drinkwater, thereby commencing this adversary proceeding (the "Drinkwater Action"). The

14 initial complaint asserted eleven claims against Mr. Drinkwater: (a) six fraudulent transfer claims

15 for relief relating to $800,000 received by Drinkwater based on then available banking records

16 (first through sixth claims for relief), (b) two breach of fiduciary duty claims for relief based on

17 the transfer of the $130 million referenced above and Mr. Drinkwater's causing the Debtor to not

18 appear for the section 341 examination or file schedules or statement of financial affairs in the

19 Debtor's bankruptcy case (seventh and eighth claims for relief), (c) a conversion claim for relief

20 based on Mr. Drinkwater's failure to turn over the Debtor's books and records (ninth claim for

21 relief), and (d) two unlawful distribution claims for relief (tenth and eleventh claims for relief).

22 Mr. Drinkwater filed an answer to the initial complaint.

23       Since then, the Trustee has gained access to and reviewed certain of the Debtor's books

24 and records and taken the examination of Mr. Drinkwater as the Debtor's designated

25 representative pursuant to Order of the Court. Based upon the Trustee's investigation, the Trustee

26 now seeks leave to file the second amended complaint (the "Second Amended Complaint")

27 attached hereto as Exhibit A.

28       The Second Amended Complaint reduces and limits this matter to four restated claims for

*ROBINS KAPLAN LLP*
*ATTORNEYS AT LAW*
*LOS ANGELES*

1  relief.  The restated claims for relief consist of (a) the breach of fiduciary duty claim relating to

2  the transfer of Debtor fund in excess of $130 million (first claim for relief), and (b) the avoidance

3  and recovery of fraudulent transfers under Bankruptcy Code section 544(b) (second through

4  fourth claims for relief).   The restated claim for breach of fiduciary duty alleges greater

5  particularity and detail regarding this claim, including identifying the recipient of the $130

6  million in Debtors funds, The Weinstein Company LLC ("TWC"), and the self-dealing conduct

7  of Mr. Drinkwater giving rise to the claim, including negotiating and then causing the Debtor to

8  continue to perform agreements with TWC and affiliates that did not reflect market terms that

9  resulted in the transfer of the $130 million in order to advance his own interests ahead of the

10 Debtor's interests.  The restated claims for fraudulent transfer allege greater particularity and

11 detail regarding the claims, including clarification as to the amount of Debtor funds transferred to

12 Mr. Drinkwater within four years of the bankruptcy (in excess of $1.8 million).  The Trustee is

13 now able to allege the claims with greater particularity and detail because the Trustee has now

14 had the opportunity to review the books and records that Mr. Drinkwater withheld from and failed

15 to disclose to the Trustee for more than three years.

16        The Court may "freely give leave [to amend a complaint] when justice so required" under

17 Federal Rule of Civil Procedure Rule 15, made applicable herein pursuant to Federal Rule of

18 Civil Procedure 7015.  This policy is to be applied with "extreme liberality," *Eminence Capital,*

19 *LLC v. Aspeon*, 316 F.3d 1048, 1051 (9th Cir. 2003), because it facilitates decisions on the merits

20 rather than on the pleadings or on technicalities. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir.

21 2003).   Here, leave to amend is justified because Mr Drinkwater is not prejudiced by the

22 amendment, no meaningful delay will result, and there is no bad faith or dilatory motive on the

23 part of the Trustee. Further, as demonstrated herein, the amendment relates back to the filing of

24 the initial complaint.  Accordingly, the Trustee's Motion should be granted.

25 **II.    BACKGROUND**

26        **A.    Involuntary Petition And Order For Relief**

27        This case ("Main Case") was commenced by the filing of an involuntary petition for relief

28 under Chapter 7 of Title 11 of the United States Code on December 27, 2011 (the "Petition

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Date"). Main Case, ECF No. 1.[1] On May 4, 2012, the Court entered that certain Order for Relief

2  on Involuntary Bankruptcy Petition. Main Case, ECF No. 14. Thereafter, Alfred H. Siegel was

3  appointed as the Trustee.

4  **B.  The Complaints Filed Against Mr. Drinkwater And Weinstein**

5  Despite multiple requests by the Trustee, no knowledgeable officer or member of the

6  Debtor (a) appeared for examination as required by section 341(a) of the Bankruptcy Code, (b)

7  filed a schedule of assets and liabilities and statement of financial affairs as required by section

8  521(a)(1) of the Bankruptcy Code, or (c) turned over the Debtor's books and records to the

9  Trustee as required by section 521(a)(4) of the Bankruptcy Code.  Drinkwater Action, Declaration

10  of Alfred H. Siegel, ECF No. 38, at p. 11, ¶¶ 1-2 and 4-5.

11  Pursuant to letters dated February 26, 2013, August 14, 2013, and March 17, 2014,

12  Anthony Friedman, the Trustee's general bankruptcy counsel, requested that Mr. Drinkwater, the

13  Debtor's former President and CEO, turnover the Debtor's books and records to the Trustee. Mr.

14  Drinkwater never responded to the letters or otherwise complied with his duties as principal of the

15  Debtor under the Bankruptcy Code. Drinkwater Action, Declaration of Anthony Friedman, ECF

16  No. 38 at p. 13, ¶¶ 1-2 and Exhibit A.

17  Prior to the expiration of the section 546(a) statute of limitations in May 2014, the Trustee

18  independently obtained bank records that evidenced that during the four years prior to the Petition

19  Date, TWC received transfers from the Debtor of approximately $130 million, and Mr.

20  Drinkwater received transfers of approximately $802,346.  Drinkwater Action, Declaration of

21  Alfred H. Siegel, ECF No. 38, at p. 11, ¶ 2.

---

[1] The Trustee does not believe he need seek judicial notice of the court records and documents referenced herein that were previously filed in the bankruptcy case or in this or another adversary proceeding pending in this Court. *See NovelPoster v. Javitch Canfield Group*, 140 F. Supp.3d 954, 960, n. 7 (N.D. Cal. 2014)("[parties] are advised for future reference that they need not seek judicial notice of documents previously filed in the same case. An accurate citation will suffice."). Nevertheless, to the extent the Court is not inclined to agree, the Trustee requests that the Court take judicial notice of such court records and documents pursuant to Federal Rule of Evidence 201(b) and (d). *See, e.g.*, *Reyn's Pasta Bella, LLC v. Visa USA, Inc.* 442 F.3d 741, 746 n.6 (9th Cir. 2006)(courts "may take judicial notice of court filings and other matters of public record"); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp.3d 1011, 1034 (C.D. Cal. 2015) ("It is well established that a court can take judicial notice of its own files and records under Rule 201 of the Federal Rules of Evidence."); *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 740 n.7 (Bankr. D. Ariz. 2010)(stating that "[t]he court takes judicial notice of its own records," including a declaration attached to motion papers).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

22
23
24
25
26
27
28

1    On May 1, 2014, the Trustee filed a complaint against Mr. Drinkwater, commencing

2    Adversary Proceeding No. 2:14-ap-01287-RN – The Drinkwater Action.  On May 2, 2014, the

3    Trustee filed a first amended complaint against Mr. Drinkwater and asserted claims for avoidance

4    and recovery of fraudulent transfers, breach of fiduciary duty, conversion and recovery of

5    corporate distributions (the "First Amended Complaint').  Drinkwater Action, ECF Nos. 1-2;

6    Declaration of Alfred H. Siegel, ECF No. 38, at p.11, ¶¶ 4-5.  On August 4, 2014, Mr. Drinkwater

7    answered the complaint, denying liability and asserting affirmative defenses.  Drinkwater Action,

8    ECF No. 10.

9    On May 1, 2014, the Trustee filed a complaint against TWC, commencing Adversary

10   Proceeding No. 2:14-ap-01286-RN (the "TWC Action"). The Trustee filed a first amended

11   complaint on May 2, 2014, asserting claims for avoidance and recovery of fraudulent transfers

12   and recovery of corporate distributions totaling $130 million.  TWC Action, ECF Nos. 1 and 2.

13   On December 11, 2014, the Court entered an order approved a stipulation and tolling

14   agreement (the "Tolling Agreement") between The Trustee and TWC, and on December 17,

15   2014, the Trustee filed a notice of dismissal of the adversary proceeding without prejudice subject

16   to the terms and conditions of the Tolling Agreement.  Main Case, ECF Nos. 91 and 93; TWC

17   Action, ECF No. 34.

18   On March 30, 2015, the Court entered an Order approving the Trustee's employment of

19   Robins Kaplan as special litigation counsel to the Trustee to prosecute the Trustee's claims

20   against (1) TWC and any affiliate of TWC and (2) Mr. Drinkwater.  Main Case, ECF No. 113.

21   On May 8, 2015, the Trustee filed a complaint against TWC and The Weinstein Company

22   Holdings LLC ("TWC Holdings," and collectively with TWC, "Weinstein"), commencing

23   Adversary Proceeding No. 15-ap-01241-RN (the "Weinstein Action").  In the Weinstein Action,

24   the Trustee asserted claims against Weinstein for avoidance and recovery of fraudulent transfers,

25   recovery of improper dividends, breach of fiduciary duty, and declaratory relief.  The Trustee

26   sought $130 million from Weinstein based on such claims. Weinstein Action, ECF No. 1.

27   On July 6, 2015, Weinstein filed a motion to dismiss the Weinstein Action. Weinstein

28   Action, ECF Nos. 14 and 18.  Following a hearing on the motion to dismiss on September 17,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   2015, the Court entered an Order dated October 23, 2015 granting, in part, and denying, in part,

2   Weinstein's motion to dismiss the Weinstein Action. The Court denied Weinstein's motion to

3   dismiss the Trustee's claims for avoidance and recovery of constructive fraudulent transfers.

4   Thus, the Trustee's fraudulent transfer claim of $130 million against Weinstein remains.

5   Weinstein Action, ECF No. 40.   Weinstein filed an answer to the complaint on November 6,

6   2015. Weinstein Action, ECF No. 42.

7   **C.    The Trustee Files A Motion To Compel Mr. Drinkwater To Perform Duties As**

8   **The Debtor's Representatives And Motion To Modify Scheduling Order**

9   On May 26, 2015, Mr. Drinkwater disclosed to the Trustee for the first time that he had

10   transferred the Debtor's missing books and records to a storage facility. More specifically, on that

11   date, Mr. Drinkwater's attorney forwarded to the Trustee's general bankruptcy counsel notices of

12   default and foreclosure received by Mr. Drinkwater from the storage company holding the

13   Debtor's books and records based on outstanding storage charges of more than $20,000 that Mr.

14   Drinkwater had not paid. Mr. Drinkwater was not willing to satisfy those charges when it was

15   understood their payment was a condition precedent to release of the books and records.[2] Main

16   Case, Declaration of Anthony Friedman, ECF No. 125 at p. 16, ¶ 3 and Exhibit B; ECF No. 126

17   at p. 19, ¶ 3 and Exhibit B; Declaration of James P. Menton, Jr. concurrently filed ("Menton

18   Declaration") ¶ 7.

19   Because Mr. Drinkwater refused to voluntarily cooperate, and his cooperation is essential

20   to the Trustee's ability to administer this estate, on August 4, 2015, the Trustee filed a motion to

21   compel Mr. Drinkwater to (1) appear for examination as the Debtor's representative, (2) turnover

22   the Debtor's books and records to the Trustee, and (3) file the Debtor's schedules of assets and

23   liabilities and statement of financial affairs in the Debtor's bankruptcy case (the "Motion to

24   Compel").  Mr. Drinkwater filed an opposition to the Motion to Compel.  Main Case, ECF Nos.

25   125-126 and 128.

26   _____

27   [2]The storage facility later released the stored records to the Trustee without payment of the storage charges. Mr.
Drinkwater has refused to reimburse the Debtor's estate for the costs incurred in removing the stored records from
the storage facility, contending he has no obligation to do so.  The Trustee disputes this contention.  Menton
28   Declaration ¶ 7.

1    On August 4, 2015, the Trustee also filed a motion to modify the then existing Scheduling

2    Order in the Drinkwater Action (the "Motion to Modify").   Pursuant to the Motion to Modify, the

3    Trustee argued, among other things, that all discovery and other deadlines in the Drinkwater

4    Action should be vacated until Mr. Drinkwater complies with any order entered by the Court

5    granting the Motion to Compel.  The Trustee further argued that, once Mr. Drinkwater completed

6    compliance with any such order, any amendment of the complaint and whether the Drinkwater

7    Action should be consolidated with the Weinstein Action could be considered and a new

8    scheduling order entered.  Drinkwater Action, ECF No. 38.  Mr. Drinkwater filed an opposition to

9    the Motion to Modify.  Drinkwater Action, ECF No. 42.

10    Following the hearing held on August 25, 2015, the Court granted the Motion to Compel

11    pursuant to an Order entered on September 9, 2015 (the "Order to Compel"), and required

12    performance of the duties identified therein by Mr. Drinkwater as the Debtor's representative,

13    including filing a list of creditors, schedules of assets and liabilities and a statement of financial

14    affairs and attending and submitting to an examination as the Debtor's representatives pursuant to

15    Federal Rules of Bankruptcy Procedure 2004 and 4002(a)(1). Main Case, ECF, No. 141.   In

16    addition, the Court granted the Motion to Modify pursuant to an Order entered on September 3,

17    2015, wherein the Court vacated all dates and deadlines set forth in the prior entered Scheduling

18    Order.  Drinkwater Action, ECF No. 53.

19    The Order to Compel required Mr. Drinkwater to file a list of creditors, schedules of

20    assets and liabilities and a statement of financial affairs by October 9, 2015. This deadline was

21    extended to November 9, 2015, pursuant to a stipulation between Mr. Drinkwater and the Trustee

22    that the Court approved by Order entered on October 9, 2015. Main Case, ECF Nos. 141 and 146-

23    147.   On November 9, 2015, Mr. Drinkwater filed a declaration regarding the Order to Compel,

24    wherein he describes his efforts to perform as required as the Debtor's representative.  Main Case,

25    ECF No. 151. Those efforts have not resulted in Mr. Drinkwater's filing schedules of assets and

26    liabilities, a list of creditors or a statement of financial affairs.

27    **D.    Scheduling Conference in Drinkwater Action**

28    On January 7, 2016, the Court held a status conference in the Drinkwater Action, and on

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

February 11, 2016, the Court entered a related Scheduling Order. Pursuant to this Scheduling Order, the Court set April 5, 2016, as the last day to file the following pre-trial motions: (a) a motion by the Trustee for an order determining whether leave to amend the first amended complaint is necessary or, in the alternative, granting leave to amend the first amended complaint (the "Motion to Amend"), (b) a motion by the Trustee for an order consolidating the Drinkwater Action and the Weinstein Action (the "Motion to Consolidate," and together with the Motion to Amend, the "Trustee's Motions"), and (c) a motion by the Defendant regarding the right to a jury trial in the Drinkwater Action ("Motion re Jury Trial")(collectively, the "Motions").  In addition, pursuant thereto, the Court scheduled the hearing on the Motions for April 26, 2016, at 2:00 p.m., and continued the status conference to such date and time.  The Court set no other dates or deadlines in the Drinkwater Action.  Drinkwater Action, ECF No. 66.  Pursuant to a stipulation of the parties that the Court approved by an Order entered April 4, 2016, the deadline for filing the Motions was extended to June 7, 2016, the hearing on any such Motions was extended to June 28, 2016, at 2:00 p.m., and the status conference was continued to such date and time.  Drinkwater Action, ECF Nos. 68 and 70.  As set forth below, pursuant to stipulations of the parties, these dates were subsequently continued by the Court.

**E.** **The Trustee Obtains Debtor Records And Takes 2004 Examination Of Mr. Drinkwater**

On or about February 10, 2016, the Trustee had a forensic image made of a copy of a hard drive on which had been backed up information from the Debtor's computer system that Mr. Drinkwater made available for such purpose. The Trustee's counsel subsequently learned that the hard drive contains approximately 469 GB of information (collectively, "ESI").  In addition to this ESI, the Trustee's counsel also obtained over 900 boxes of information and documents of the Debtor that had been stored in a storage facility (the "Hard Copy Documents") controlled by Mr. Drinkwater.  An initial "first-cut" review of the 900 boxes was made, and information contained in over 200 boxes was scanned by an outside vendor for further review and analysis by the Trustee's counsel. The scanning was not completed until in or about May 2016. The Hard Copy Documents ultimately scanned exceed 60,000 documents and total more than 400,000 pages.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Menton Declaration ¶¶ 6-8.

2         Subsequently, in order to afford additional time for the Trustee to review ESI and Hard

3    Copy Documents and to take Mr. Drinkwater's testimony pursuant to a 2004 Examination

4    pursuant to the Motion to Compel before determining whether to prosecute the existing claims

5    against Mr. Drinkwater, dismiss those claims, seek leave to amend the first amended complaint or

6    seek to consolidate the Drinkwater Action with the Weinstein Action, the Trustee and Mr.

7    Drinkwater stipulated to extend the deadline to file the Motions and for a hearing on any such

8    Motions and to continue the status conference. The Court approved the stipulation by Order

9    entered June 1, 2016, pursuant to which the Court (a) extended the deadline to file the Motions to

10   August 23, 2016, (b) extending the hearing on any such Motion to September 13, 2016, at 2:00

11   p.m. and (c) continued the status conference to September 13, 2016, at 2:00 p.m.   Drinkwater

12   Action, ECF Nos. 72 and 74; Menton Declaration ¶ 9.

13        Concurrent with the foregoing stipulation, the Trustee and Mr. Drinkwater also

14   stipulated to conducting Mr. Drinkwater's 2004 Examination on August 4, 2016, or such other

15   date and time as the parties may agree.  Main Case, ECF No. 166.  The Court approved this

16   stipulation by Order entered June 1, 2016.  Main Case, ECF No. 168.  Mr. Drinkwater's 2004

17   Examination took place on August 12, 2016, and counsel for the Trustee, Mr. Drinkwater and

18   Weinstein attended.  Menton Declaration ¶ 10.

19        After Mr. Drinkwater's 2004 Examination, the parties, by stipulation, requested that the

20   Court continue the deadline for filing the Motions and the hearing thereon and to continue the

21   status conference to allow them to try and reach a consensual resolution of the Motions and/or a

22   settlement of this adversary proceeding before being required to expend the time and resources

23   relating to the Motions and in otherwise proceeding with the litigation. The Court approved this

24   stipulation by Order entered August 22, 2016, pursuant to which the Court (a) extended the

25   deadline to file the Motions to October 11, 2016, (b) extended the hearing on any such Motion to

26   November 1, 2016, at 2:00 p.m., and (c) continued the status conference to November 1, 2016, at

27   2:00 p.m.  Drinkwater Action, ECF No. 77 and 79. No consensual resolution of the Motions

28   and/or settlement of this adversary proceeding as resulted since then.  Menton Declaration ¶ 11.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### F.    Status of the Drinkwater Action

This litigation is still in its early stages. No motion to dismiss was filed and no summary judgment motion has been filed. The parties have conducted limited formal discovery to date. The parties conducted their Rule 26(f) conference in July 2015, and subsequently made their Initial Disclosures. The Trustee served document requests and interrogatories on Mr. Drinkwater to which he responded in August 2015. Mr. Drinkwater served document requests and interrogatories on the Trustee to which the Trustee responded in September 2015. There is no pending written discovery and no depositions have been taken. There is no discovery deadline and no trial date set in this action. There are no other dates or deadlines in this action other than dates associated with this Motion and the concurrently filed Motion to Consolidate. Menton Declaration ¶ 12.

## III.    ARGUMENT

### A.    The Court Should Grant Leave To Amend Under Rule 15

Federal Rule of Civil Procedure 15(a), made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure, provides that leave to amend "should [be] freely give[n] . . . when justice so requires." This policy is to be applied with "extreme liberality," *Eminence Capital, LLC v. Aspeon*, 316 F.3d 1048, 1051 (9th Cir. 2003), because it facilitates decisions on the merits rather than on the pleadings or on technicalities. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003). "In the absence of any apparent or declared reason – such as undue influence, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely given."" *Foman v. David*, 371 U.S. 178, 182, 83 S. Ct. 227 (1962). "Where there is a lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion." *Howey v. United States*, 481 F.2d 1187, 1190-91 (9th Cir. 1973) (amendment five years into case appropriate); *see also Moore v. Kayport Package Express, Inc*, 885 F.2d 531, 538 (9th Cir. 1989) (denial of leave to amend after a responsive pleading has been filed is reviewed for abuse of

1    discretion, but such denial is strictly reviewed in light of the strong policy permitting amendment).

2    The party opposing the amendment has the burden of showing prejudice. *DCD Programs, Ltd. V.*

3    *Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).

4        Granting leave to file the Second Amended Complaint promotes the efficient use of judicial

5    resources.  The Second Amended Complaint eliminates several causes of action and therefore the

6    need for adjudication of these claims. The Second Amended Complaint is narrowly tailored to

7    reflect the Trustee's present understanding of the case so that the action can more effectively

8    proceed on the merits.  The Second Amended Complaint does not add any new causes of action

9    and does no more than restate the originally asserted fraudulent transfer and breach of fiduciary

10   duty claims with greater particularity.  *See Foman*, 371 U.S at 182 ("If the underlying facts or

11   circumstances relied upon by a plaintiff [in a proposed amended complaint] may be a proper

12   subject of relief, he ought to be afforded an opportunity to test his claim on the merits.")

13       Moreover, no substantial reason counsels against granting the relief to file the Second

14   Amended Complaint.  The Trustee does not act with bad faith, undue delay or dilatory motive,

15   and seeks leave to file the amended complaint within the time frame established under the Court's

16   Scheduling Order.[3] Further, the Second Amended Complaint does not stem from repeated failures

17   to cure a deficiency in the prior complaints.  Nor would the Second Amended Complaint

18   cause under prejudice to Mr. Drinkwater.  Mr. Drinkwater cannot be prejudiced, or caught off

19   guard, by the amended complaint, since Mr. Drinkwater has first-hand knowledge of the role he

20   played in managing the Debtor and the transactions at issue, including the $130 million of Debtor

21   funds transferred to TWC and the Debtor funds he received personally. The Second Amended

22   Complaint does not involve the addition of any new defendants or set forth any new causes of

23   action.  Indeed, the Second Amended Complaint simply clarifies the details of the misconduct of

24   Mr. Drinkwater in putting his own interests ahead of the Debtor's interests to the detriment of the

25

26   _____

[3] Even if there were delay, which there was not, "[d]elay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs*, 833 F.2d at 186; *see also Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973)("The

27   purpose of the litigation process is to vindicate meritorious claims.  Refusing, solely because of delay, to permit an amendment to a pleading in order to state a potentially valid claim would hinder this purpose while not promoting

28   any other sound judicial policy.")

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Debtor. Although the case began some time ago, in 2014, this litigation is still in its early stages.

2    The parties have conducted limited formal discovery to date.  There are no discovery deadlines in

3    this case, and there is no impending trial date that the proposed amended complaint would

4    interrupt. Further, the Trustee seeks to consolidate this litigation with the Weinstein litigation,

5    which is also still in its early stages. Mr. Drinkwater will have ample time to respond to the

6    Second Amended Complaint and otherwise defend his interests in the litigation.  Therefore, no

7    meaningful prejudice would result to Mr. Drinkwater in allowing the Second Amended

8    Complaint under these circumstances.

9         Finally, the filing of Second Amended Complaint cannot be said to be "futile." "[A]

10   proposed amendment is futile only if no set of facts can be proved under the amendment to the

11   pleadings that would constitute a valid and sufficient claim or defense." *Sweaney v. Ada County,*

12   *Idaho*, 119 F.3d 1385, 1393 (9th Cir. 1997) (alteration in original).   The Second Amended

13   Complaint easily meets this threshold, particularly given that the amendments restate claims

14   previously asserted with greater specificity.

15        Accordingly, consistent with the liberal standard that applies to motion to amend under

16   Rule 15(a)(2), the Court should grant the Trustee's request for leave to amend to file the Second

17   Amended Complaint.

18        **B.    The Proposed Amended Complaint Relates Back Under Rule 15**

19        Federal Rule of Bankruptcy Procedure 15(c)(1)(B) requires relation back when "the

20   amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set

21   out – or attempted to be set out – in the original pleading."  "The relation back doctrine [of Rule

22   15(c)] is 'liberally applied.'" *Asacrco, LLC v. Union Pac. R.R. Co*., 765 F.3d 999, 1004 (9th Cir.

23   2014) (citation omitted).  The Rule is satisfied where the subsequent allegations "share a common

24   core of operative facts so that the adverse party has fair notice of the transaction, occurrence, or

25   conduct called into question." *Martell v. Trilogy, Ltd*., 872 F.2d 322, 325 (9th Cir. 1989).  The

26   Ninth Circuit in *Martell* aptly noted:

27             Limitation is suspended by the filing of a suit because the suit warns the defendant to

28             collect and preserve his evidence in reference to it.  When a suit is filed in a federal court

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    under the Rules, the defendant knows that the whole transaction described in it will be

2    fully sifted, by amendment if need be, and that the form of the action or the relief prayed

3    or the law relied on will note be confined to their first statement.

4    *Id*. at 326 (citation omitted).  As discussed below, the proposed amended complaint relates back.

5    First, the First Amended Complaint provided the proper notice. In particular, it provides,

6    in part: "Trustee reserves his right to supplement and amend the allegations contained in this

7    Complaint, including, but not limited to, the right to (i) allege further information regarding all

8    Claims for Relief, including additional transfers of interest in the Debtor's assets or additional

9    liabilities incurred by the Debtor . . . and/or (iv) allege additional causes of action in connection

10   with laws and facts set forth herein (collectively, the "Amendments"), that may become known to

11   the Trustee at any time during this adversary proceeding through formal discovery or otherwise,

12   and for the Amendments to relate back to this . . . Complaint." Drinkwater Action, First Amended

13   Complaint, ECF No. 2, ¶ 8. This language alone is sufficient notice under Rule 15.

14   Second, relation back is proper because there is a factual nexus between the Second

15   Amended Complaint and the First Amended Complaint.  In that regard, the Second Amended

16   Complaint clarifies and provides greater particularity and detail regarding the fraudulent transfer

17   and breach of fiduciary duty claims set forth in the First Amended Complaint. *See U.S. v. Hicks*,

18   283 F.3d 380, 388 (D.C. Cir. 2002) (amendments that clarify or expand facts will relate back); *see*

19   *also* 6A Miller, Federal Practice and Procedure, § 1497 at 87-89 (West 2010) ("[A]mendments

20   that . . . expand or modify the facts alleged in the earlier pleading meet the Rule 15(c)(1)(B) test

21   and will relate back. Thus, amendments that do no more than restate the original claim with

22   greater particularity or amplify the details of the transaction alleged in the preceding pleading fall

23   within Rule 15 (c)(1)(B).").

24   Third, Mr. Drinkwater had sufficient notice of the Second Amended Complaint based on

25   the allegations in the First Amended Complaint.  The First Amended Complaint asserts that Mr.

26   Drinkwater used his control as an insider of the Debtor to cause the dissipation of in excess of

27   $130 million to insiders, including officers, directors and members of the Debtor, to the

28   substantial harm of the Debtor and which breached his fiduciary duties to the Debtor.  Drinkwater

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Action, First Amended Complaint, ECF No. 2, ¶¶ 45-53.   In addition, the First Amended

2   Complaint asserts that Mr. Drinkwater's mismanagement of the Debtor caused the dissipation of

3   Debtor funds that included fraudulent transfers to Mr. Drinkwater.   Drinkwater Action, ECF No.

4   2, ¶¶ 7-44, 49 and 52. The First Amended Complaint seeks to avoid and recover the fraudulent

5   transfers, or the value thereof, from Mr. Drinkwater for the benefit of the estate under Bankruptcy

6   Code section 544(b) and 548.   Drinkwater Action, ECF No. 2, ¶¶ 7-44.   The Second Amended

7   Complaint provides additional information relating to the same conduct and claims alleged in the

8   First Amended Complaint. Thus, the breach of fiduciary duty and fraudulent transfer claims

9   asserted in the Second Amended Complaint arise out the same common core of operative facts

10  such that the claims will likely be established by the "same kind of evidence." The claims relate

11  back and, therefore, are timely.

12  **IV.   CONCLUSION**

13          For all the foregoing reasons, the Trustee respectfully requests the Court enter an order (a)

14  granting the Motion, (b) granting the Trustee leave to file the Second Amended Complaint, and

15  (c) granting such other and further relief as this Court deems just and proper.

16

17  DATED:  October 11, 2016              **ROBINS KAPLAN LLP**

18                                        By:  /s/ James P. Menton, Jr.
                                               David B. Shemano
19                                             James P. Menton, Jr.

20                                        Special Litigation Counsel for Alfred H. Siegel,
                                          Chapter 7 Trustee
21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT A

ROBINS KAPLAN LLP
David B. Shemano (State Bar No. 176020)
dshemano@robinskaplan.com
James P. Menton, Jr. (State Bar No. 159032)
jmenton@robinskaplan.com
2049 Century Park East, Suite 3400
Los Angeles, CA  90067
Telephone:        310-552-0130
Facsimile: 310-229-5800

Special Litigation Counsel for Alfred H. Siegel, Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | CASE NO.:  2:11-bk-62283-BB |
| GENIUS PRODUCTS, LLC, | Chapter 7 |
| Debtor. | |
| ALFRED H. SIEGEL, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF GENIUS PRODUCTS, LLC, | Adv. No. 2:14-ap-01287-BB |
| Plaintiff, | **[Proposed] SECOND AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS** |
| v. | |
| TREVOR DRINKWATER, | |
| Defendant. | |

Plaintiff Alfred H. Siegel, not individually but solely in his capacity as Chapter 7 Trustee

(the "Plaintiff" or "Trustee") for the bankruptcy estate of Genius Products, LLC (the "Debtor"),

alleges as follows:

## JURISDICTION AND VENUE

1.        This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§ 1334, 28 U.S.C. § 157 and Local Rules and Orders of the United States District Court for the

Central District of California governing the reference and conduct of proceedings arising under or

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   related to cases under Title 11 of the United States Code, including General Order No. 266, dated

2   October 9, 1984. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §

3   157(b)(2)(A), (H) and (O), and Plaintiff consents to entry of a final judgment by this Court.

4       2.      Venue is proper in this Court under 28 U.S.C. § 1409(a) as this adversary

5   proceeding arises under and in connection with a case under Title 11 which is pending in this

6   district.

7                                    **PARTIES**

8       3.      This case was commenced by the filing of an involuntary petition for relief under

9   Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on December 27, 2011

10  (the "Petition Date") against Genius Products, LLC (the "Debtor") by creditors World Wrestling

11  Entertainment, Inc., Thought Equity Motion, Inc., and LD Entertainment.

12      4.      Thereafter, on May 4, 2012, the Court entered that certain Order for Relief on

13  Involuntary Bankruptcy Petition.  Thereafter, Alfred H. Siegel was appointed as Chapter 7

14  Trustee for the Debtor's bankruptcy estate, a capacity in which he continues to serve.

15      5.      Defendant Trevor Drinkwater (the "Defendant") is an individual residing in Los

16  Angeles County, California, and is subject to the jurisdiction of this Court.  Defendant was an

17  insider of the Debtor at all times relevant to the allegations of this Complaint because Defendant

18  was President of the Debtor from on or before July 21, 2006 to January 2, 2008, and Chief

19  Executive Officer of the Debtor from on or before July 21, 2006 to November 15, 2010.

20                          **GENERAL ALLEGATIONS**

21  **A.    The Debtor And Weinstein Enter Into Distribution Agreement**

22      6.      Genius Products, Inc. ("GPI") was an entertainment company primarily involved

23  in the business of producing, publishing and distributing audio and video products.  GPI's

24  products were sold in retail outlets under various branded and non-branded names.  GPI was a

25  publically traded corporation headquartered in Santa Monica, California.

26      7.      The Weinstein Company LLC ("TWC") is a production and distribution company

27  that was launched in October 2005 by Bob and Harvey Weinstein, the brothers who founded

28  Miramax Films in 1979.  TWC is a business entity headquartered in New York, New York.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

8.      TWC is a subsidiary of The Weinstein Company Holdings LLC ("TWC Holdings" and together with TWC, "Weinstein"). TWC Holdings is a business entity headquartered in New York, New York.

9.      The Debtor was originally formed by TWC Holdings as The Weinstein Company Funding LLC ("TWC Funding") pursuant to a Certificate of Formation filed in the office of the Secretary of State of the State of Delaware on May 10, 2005. At the time of formation, TWC Funding was wholly-owned and controlled by TWC Holdings.

10.      On December 5, 2005, GPI and Weinstein agreed to form a new business venture that would operate GPI's business and become the exclusive distributor of Weinstein home video products (the "Weinstein Transaction").

11.      In connection with the Weinstein Transaction, on or about July 21, 2006, GPI and TWC Holdings entered into the Amended and Restated Limited Liability Company Agreement of Genius Products, LLC (the "Operating Agreement"). Pursuant to the Operating Agreement, among other things, (a) TWC Funding changed its name to Genius Products, LLC, (b) GPI contributed its business and assets to the Debtor, and received in exchange a 30% membership interest in the Debtor, and (c) TWC Holdings retained a 70% membership interest in the Debtor.

12.      In connection with the Weinstein Transaction, on or about July 17, 2006, TWC, as licensor, and the Debtor, as licensee, entered into a Distribution Agreement (the "Distribution Agreement") granting the Debtor the exclusive right to distribute Weinstein home video products ("Videos") in the United States.   Under the Distribution Agreement, the Debtor was responsible for manufacturing, merchandising, marketing, and distributing the Videos, as well as for billing and collection.  In exchange, the Debtor received a distribution fee plus reimbursement of certain expenses, and all remaining proceeds were to be paid to TWC.  Thereafter, the Debtor distributed Videos in the home video market in accordance with the terms of the Distribution Agreement.

**B.      The Distribution Agreement Does Not Reflect Market Terms**

13.      The terms of the Distribution Agreement gave TWC, and not the Debtor, ultimate control over all aspects of the distribution of the Videos.  TWC, and not the Debtor, had ultimate control over (a) which titles would be distributed by the Debtor, (b) the timing of the distribution

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

by the Debtor, (c) the pricing of the Videos, (d) the marketing strategy for the Videos, (e) the marketing budget for the Videos, (f) the manufacture and distribution of the Videos by the Debtor, (g) the artwork and design layout for the Videos, (h) the right to extend credit to the Debtors' customers, (i) the manner of distribution of the Videos by the Debtor, including sales methods and policies, (j) all marketing materials, media spends, and media buys, (k) all of the Debtors' return policies, rebates, refunds, credits and discounts, (l) the number of Videos to be replicated and shipped to the Debtor's customers, and (m) the number and identity of the Debtor's employees dedicated to selling and marketing Videos.

14.    The terms of the Distribution Agreement were onerous and one-sided in favor of TWC.  There was no practical possibility that the Debtor could operate profitably while bound to the terms of the Distribution Agreement.  By way of example:

a.    While a market distribution fee for an independent home video distributor of titles included in the Weinstein library would be in the range of 15% to 17.5% of net receipts, the Debtor was only entitled to a distribution fee of 5% of net receipts.  Further, if a title performed better than expected, the Debtor's distribution fee with respect to the title was retroactively reduced to as low as 3%.

b.    While a market reserve for the return of Videos by customers would be in the range of 25% to 30%, the Debtor was only entitled to a reserve of 17.5%.

c.    While market terms would have required the Debtor to dedicate one or two employees exclusively to the Weinstein titles, the Debtor was required to employ approximately 40 people at an annual cost of approximately $2 million dedicated exclusively to administering the Weinstein titles.  Market terms and industry norms would have permitted substantially all of the Debtor's employees to work across product lines.  The expense of these dedicated employees was paid from the Debtor's overhead and was not a recoupable expense under the Distribution Agreement.

d.    While market terms and industry norms would have permitted the Debtor to select the replicator for the videos, which would have permitted the Debtor to hire the most economical replicator and obtain the benefit of a volume discount all of the Debtor's titles, TWC

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

had the right to select and did select the Debtor's replicator for the Weinstein titles.  Upon

information and belief, TWC negotiated advance payments from the chosen replicator directly to

TWC, which was then recouped by the replicator through a higher per unit cost charged by the

replicator to the Debtor.

e.    While market terms and industry norms would have permitted the Debtor

to negotiate and distribute titles for third parties in the Debtor's discretion, TWC had the right to

veto and usurp any proposed third party transaction.  Upon information and belief, TWC

exercised its veto rights to require the Debtor to expend resources on unprofitable Weinstein titles

instead of profitable third party titles.

f.    While market terms and industry norms would have provided both the

Debtor and TWC the right to extend, or not extend, the term of the Distribution Agreement, only

TWC had the right to extend, or not extend, the term.

g.    While market terms and industry norms would have provided the Debtor

with the exclusive right to distribute Videos in all formats and technologies, the Debtor was not

granted any rights with respect to Videos distributed in Blu-Ray and other new formats, which

enabled TWC to usurp the marketing subsidies paid by manufacturers to distributors with respect

to such new formats.

h.    While market terms and industry norms would have permitted the Debtor

to outsource or sublicense to third parties any functions where such outsourcing or sublicensing

would be economical, the Debtor was prohibited from outsourcing or sublicensing any function

without TWC's consent.

i.    While the Debtor was required to recoup its expenses on a title by title

basis, TWC, and not the Debtor, had ultimate control over all material aspects of the distribution

of each title, so the Debtor had no capability to control or minimize its expenses on a title by title

basis.  For example, the Debtor had no right not to distribute a title once designated by TWC for

distribution, and TWC had the right to approve the budget for each release.  Upon information

and belief, TWC required the Debtor to spend more money on titles than were reasonably

required for the titles.  Further, TWC, and not the Debtor, controlled the initial release dates and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

had consent rights to all marketing strategies.  Upon information and belief, TWC required the Debtor to distribute certain titles on specific key dates instead of permitting the Debtor to release a more marketable competitor's title at the same time.

j.    While market terms and industry norms would have permitted the Debtor to sell Videos to customers as determined by the Debtor based upon the characteristic of the title in order to maximize sales, the Debtor was penalized for any sales to wholesalers in excess of 12.5% of net receipts.

k.    While the Debtor was required to pay significant costs and expenses in advance of the actual distribution of a title, including marketing costs to generate customer awareness of a title, the Debtor's interest expense from the date the expense was incurred to the date the expense was reimbursed or recouped was not a recoupable expense.

l.    While TWC had ultimate authority to determine the number of Videos that would be replicated and distributed, with the cost to be paid by the Debtor, the Debtor had no right to sell excess inventory at a discount without TWC's consent.  At the end of the term of the Distribution Agreement, the Debtor had no extended period to sell any excess inventory and all such inventory had to be destroyed.

m.    While market terms and industry norms would have permitted the Debtor to recoup the expense of creative services such as key art, illustration, packaging design, logos and title treatment, the Debtor was prohibited from recouping such expenses unless the service was outsourced to a third party, which the Debtor was prohibited from doing unless TWC consented.

15.    As a result of the terms of the Distribution Agreement, substantially all of the revenue from the home video distribution of the titles was transferred to Weinstein, while substantially all of the expenses of the distribution were paid by the Debtor.  The effect of the Distribution Agreement was thus to transfer to Weinstein the Debtor's cash by charging the Debtor above-market rates in the Distribution Agreement instead of the net revenues that could be obtained if the Distribution Agreement reflected market terms and industry norms.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Exhibit A
Page 19

**C.    Purchase Agreement and Amended Distribution Agreement**

16.    By late 2008, the Debtor was running out of cash and on the verge of bankruptcy. As a result, and in order to allowed Weinstein to extricate itself from the relationship with the Debtor at minimum cost to Weinstein, on or about January 1, 2009, the Debtor, GPI, TWC, TWC Holdings and other parties entered into a Purchase and Sale Agreement (the "Purchase Agreement"). Pursuant to the Purchase Agreement, TWC Holdings agreed to transfer majority ownership of the Debtor to a restructuring investment firm called Quadrant Management, Inc. Further, the Debtor and TWC agreed to settle all monetary obligations owing to TWC by the Debtor on an accrued basis for all distribution activity pursuant to the Distribution Agreement through September 30, 2008.  In connection therewith, among other things, the Debtor issued to TWC a promissory note in the principal amount of $20 million (the "TWC Note").

17.    In connection with the Purchase Agreement, effective January 1, 2009, the Debtor and TWC entered into an Amended and Restated Distribution Agreement (the "Amended Distribution Agreement").  The Distribution Agreement was modified in a purported attempt to provide the Debtor with marginally more operating flexibility and cash flow while the transactions contemplated by the Purchase Agreement were consummated.  However, as a purported "incentive" for TWC to enter into the Amended Distribution Agreement, TWC granted itself the right to certain "Licensor Incentive Amounts," which obligated the Debtor to pay to TWC up to an additional $12,000,000 based upon distribution fees owed to the Debtor that accrued in 2009.

18.    Notwithstanding the modifications set forth in the Amended Distribution Agreement, the terms of the Amended Distribution Agreement remained onerous and one-sided in favor of TWC, and there was no practical possibility that the Debtor could operate profitably while complying with the terms of the Amended Distribution Agreement.

**D.    The Debtor Ceases Operations**

19.    On September 15, 2009, the Debtor sold substantially all of its assets to Universal Music Group Distribution, Corp. ("UMG') (the "UMG Transaction").

20.    As a condition to closing the UMG Transaction, the Debtor was required to settle

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

certain disputes with Weinstein and to terminate the Debtor's relationship with Weinstein. In satisfaction thereof, among other things, the Debtor, TWC and other parties agreed to the terms of a Binding Restructuring Term Sheet Agreement (the "Restructuring Agreement," and together with the Distribution Agreement, the Purchase Agreement, the Amended Distribution Agreement, and the TWC Note, the "Agreements").

21.     Pursuant to the Restructuring Agreement, the Amended Distribution Agreement was terminated with retroactive effect from May 31, 2009, as a result of which effective as of May 31, 2009, all rights previously licensed to the Debtor under the Distribution Agreement reverted to TWC, and the Debtor agreed to make various payments to TWC set forth in the Restructuring Agreement.  In addition, with retroactive effect to June 1, 2009, the Debtor was engaged as TWC's exclusive provider of distribution services for a term ending on October 31, 2009, or until September 20, 2009 if the UMG Transaction closed on or before September 15, 2009.  The Debtor also agreed to continue to provide certain distribution services to TWC for the period September 21, 2009 and continuing through September 27, 2009.

22.     The terms of the Restructuring Agreement were onerous and one-sided in favor of TWC, and there was no practical possibility that the Debtor could operate profitably while complying with the terms of the Restructuring Agreement.

23.     As an additional condition to the consummation of the UMG Transaction, effective upon the closing thereof, UMG and TWC entered into a distribution agreement by which UMG was granted the right to distribute certain TWC-controlled content.

24.     Following the UMG Transaction, the Debtor subsequently ceased operations.

**E.     The Debtor's Transfers To Weinstein While Insolvent**

25.     The Debtor's publicly reported net loss for the year ended December 31, 2006, was approximately $19.7 million. The Debtor's publicly reported net loss for the year ended December 31, 2007, was approximately $18.8 million. On March 17, 2008, GPI publicly reported that "the [Debtor] may [n]ever achieve or sustain profitability in the future."  The Debtor's publicly reported net loss for the nine months ended September 30, 2008, was approximately $89.8 million. On September 30, 2008, the Debtor's publicly reported total assets were disclosed

1   to be worth approximately $113 million (exclusive of purported goodwill estimated at $68

2   million), while current liabilities were in the amount of $195 million.  On March 30, 2009, GPI

3   publicly reported that "[b]ased on current operating results, the [Debtor] will fall short of

4   generating enough cash flow from continuing operations to timely meet its financial

5   commitments and obligations."

6        26.    At the time of the execution of the Agreements and at all times thereafter, (a) the

7   Debtor was insolvent, as that term is defined at section 101(32) of the Bankruptcy Code and as

8   such term is used in section 3439.02 of the California Code of Civil Procedure, or was rendered

9   insolvent as a result thereof, and/or (b) the Debtor was engaged in business or a transaction, or

10  was about to engage in business or a transaction, for which its remaining assets were

11  unreasonably small in relation to such business or transaction, and/or (c) the Debtor intended to

12  incur, or believed or reasonably should have believed that it would incur, debts beyond the

13  Debtor's ability to pay as such debts matured.

14       27.    From and after December 27, 2007, the Debtor transferred $130,459,452.57 to

15  TWC (the "Weinstein Transfers"). Each of the Weinstein Transfers constituted a transfer of the

16  Debtor's property within four years of the Petition Date.

17       28.    At the time of each of the Weinstein Transfers, and at all times thereafter, (a) the

18  Debtor was insolvent, as that term is defined at section 101(32) of the Bankruptcy Code and as

19  such term is used in section 3439.02 of the California Code of Civil Procedure, or was rendered

20  insolvent as a result thereof, and/or (b) the Debtor was engaged in business or a transaction, or

21  was about to engage in business or a transaction, for which its remaining assets were

22  unreasonably small in relation to such business or transaction, and/or (c) the Debtor intended to

23  incur, or believed or reasonably should have believed that it would incur, debts beyond the

24  Debtor's ability to pay as such debts matured.

25  **F.    Defendant's Self-Dealing**

26       29.    Defendant joined GPI as executive vice president in or about July 2004, after

27  serving from 1999 to 2003 as a senior vice president of sales for Warner Home Video.  His initial

28  annual base compensation was $175,000, later increased to $275,000 in or about July 2005. He

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   became CEO of GPI in February 2005.

2       30.    At the time Defendant joined GPI, GPI's business primarily consisted of

3   distributing low-volume direct to video titles that were sold by retailers at highly discounted

4   prices, including in dollar bins.  GPI's revenues were approximately $16.6 million in 2004 and

5   less than $20 million in 2005.  GPI historically, including in 2004 and 2005, operated at a

6   significant loss.

7       31.    Defendant realized that, because of the nature of GPI's business, it was highly

8   unlikely that Defendant would personally realize any material increase of income, wealth, or

9   industry reputation while serving as an officer of GPI.  Therefore, Defendant determined to

10  change GPI's business to maximize the potential and actual benefit to Defendant personally, even

11  if the change of business created significant risk for GPI and its constituencies.

12      32.    The opportunity Defendant was looking for occurred in 2005.  After Weinstein

13  separated from Disney in 2005 and became independent, Weinstein needed to negotiate

14  agreements for the distribution of the theatrical titles it intended to produce and release.

15  Defendant determined to negotiate a transaction pursuant to which GPI would distribute

16  Weinstein's theatrical titles.  While GPI had no history of distributing theatrical titles, and such

17  distribution would require a significant increase in expenditure by GPI, distributing Weinstein

18  theatrical titles would significantly enhance Defendant's industry reputation and provide

19  Defendant the opportunity to negotiate a significant increase in his compensation.

20      33.    Defendant was competing with more established distributors including major

21  studios.  Defendant determined to reach an agreement with Weinstein no matter the terms and no

22  matter the risk to GPI's business and constituencies.  Therefore, Defendant, negotiating deal

23  terms on behalf of GPI, agreed to terms that were far below market and far more favorable to

24  Weinstein than Weinstein could have obtained from any other distributor.  In substance,

25  Weinstein proposed onerous terms that were hugely favorable to Weinstein in every respect and,

26  instead of countering the terms to reflect the market and GPI's best interests, Defendant agreed to

27  Weinstein's onerous terms.  Based upon the economics of deal terms Defendant negotiated, it was

28  impossible for GPI to operate profitably under any plausible scenario.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Exhibit A
Page 23

34.    While the deal terms Defendant negotiated were onerous for GPI, the terms were very beneficial to Defendant personally.  In addition to the benefit of representing himself in the industry as Weinstein's distributor, the Defendant negotiated an amendment to his employment contract, effective December 5, 2005, that provided for, among other things, (a) a three-year term, with up to two one-year extensions at the company's option, and (b) base compensation of $425,000 in year one, $475,000 in year two, $525,000 in year three, $625,000 in year four, and $675,000 in year five, plus annual bonuses in each year of up to 50% of base salary based on performance. These conditions would only become effective upon the closing of the Weinstein Transaction.

35.    On or before July 21, 2006, Defendant became the President and CEO of the Debtor and now had the fiduciary duty to act in the best interests of the Debtor as opposed to putting his own interest ahead of the Debtor's interest.  Notwithstanding his new duty to the Debtor, he continued to put his own interests first.  Defendant, as the Debtor's President and CEO, caused or authorized the Operating Agreement and the Debtor's entry into the Distribution Agreement. The terms of the Distribution Agreement were onerous and detrimental to the Debtor. A fiduciary acting in the best interests of the Debtor would have refused to enter into the Distribution Agreement or renegotiated the terms.  Instead, Defendant ignored the Debtor's interest because the consummation of the Weinstein Transaction benefited him personally.  As a result of the Operating Agreement and the Distribution Agreement, among other things, (a) the Defendant become the CEO and President of the Debtor that had an agreement to distribute Weinstein titles, (b) Defendant increased his annual base compensation by almost 65% to $425,000, and (c) Defendant received a 2006 bonus of $200,000, despite the Debtor's net loss of approximately $19.7 million in 2006.

36.    In the ensuing years, interested in maintaining his income, power and prestige associated with distributing Weinstein titles, Defendant continued to put his personal interests ahead of his fiduciary duties to the Debtor. In order to satisfy Weinstein's interests, Defendant caused or authorized the Debtor (a) to grow rapidly in the first half of 2007 to service Weinstein's business, at a time when the Debtor did not have a source of third party working capital, (b) to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

continue to perform under the Distribution Agreement even though the Debtor was losing

significant amounts money under the Distribution Agreement, and (c) to continue to make the

Weinstein Transfers. Defendant did so even though Weinstein was failing to deliver the high-

volume theatrical titles that provided the financial justification for the Weinstein Transaction and

the onerous terms originally agreed to by GPI.  Instead of delivering high-volume theatrical titles,

Weinstein was delivering a combination of (a) unsuccessful theatrical titles that had failed to meet

box office projections, and (b) titles that Weinstein had determined to distribute direct to video

instead of theatrically.  The performance of the Weinstein titles was so below projections and so

unprofitable that the Debtor required a "comfort letter" from Weinstein in August 2007 to assure

lenders that Weinstein would continue to defer a portion of payables owed by the Debtor and by

which letter Weinstein agreed to waive any remedies attributable to past deferred payments and

non-timely reporting under the Distribution Agreement that occurred prior to August 10, 2007.

All through 2006 and 2007 Defendant knew or should have known that the Debtor was not and

could not be profitable by operating in accordance with the terms of the Distribution Agreement,

and the Debtor's financial condition was steadily deteriorating.

37.    The disastrous results of the Distribution Agreement in 2006 and 2007 did not

cause Defendant to change his behavior, and he continued to put his interests and Weinstein's

interests ahead of the Debtor's interests.  Defendant continued to follow Weinstein's instructions

with respect to the Distribution Agreement, and continued to transfer millions of dollars, to

Weinstein, through September 2009.  He did so because he personally continued to benefit,

including receiving a $500,000 bonus approved by Weinstein in January 2009.  During this time,

Defendant caused the Debtor to fail to make required payments to certain of the Debtor's

creditors. Even after the Debtor sold substantially all of its assets to UMG in connection with the

UMG Transaction, and after the Debtor did not have the funds to pay third-party creditors,

Defendant continued to receive compensation from the Debtor until November 2010.

38.    Defendant's strategy of putting his own interests and Weinstein's interests ahead

of the Debtor's interests paid off after the Debtor ceased operations. Starting in or about 2010,

Weinstein granted certain distribution rights to certain Weinstein titles to a company controlled

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61245649.1

- 12 -

by Defendant on terms far more favorable than what Defendant had negotiated on behalf of the Debtor.

39.     From and after December 27, 2007, Defendant received at least $1,800,000.00 from the Debtor for salary, bonuses and expense reimbursement (the "Drinkwater Transfers"). Each of the Drinkwater Transfers constituted a transfer of the Debtor's property within four years of the Petition Date.

40.     Defendant's compensation, which was disproportionate to compensation that would normally be paid for such service in the marketplace, was paid despite Defendant having engaged in self-dealing or otherwise breached his fiduciary duties to the Debtor and despite the fact that the Debtor's financial condition was steadily deteriorating during the four years prior to the Petition Date.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty and Self-Dealing)

41.     The Trustee incorporates herein by this reference paragraphs 1 through 40, inclusive, of this Complaint as if set forth in full herein.

42.     By reason of his position as an officer of the Debtor, Defendant owed the Debtor and its creditors fiduciary obligations of trust, loyalty, good faith and due care, and was required to use his utmost ability to control and manage the Debtor in a fair, just, honest and equitable manner.  Defendant was required to act in furtherance of the best interests of the Debtor and not in furtherance of his personal interest or benefit, or the interest or benefit of Weinstein.

43.     Defendant repeatedly breached his fiduciary duties of loyalty and good faith to the Debtor by exercising his control of the Debtor primarily, if not exclusively, to benefit himself and Weinstein and enhance his executive positions at the Debtor and the compensation, power and prestige that he enjoyed as a result of holding those positions and managing the Debtor.

44.     Defendant, as an officer of the Debtor, put his personal interests and the interests of Weinstein ahead of his fiduciary duties of loyalty and good faith to the Debtor, resulting in Defendant's mismanagement of the Debtor, including Defendant (a) causing the Debtor to enter into the Agreements, (b) causing the Debtor to continue to operate under the Agreements even

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

though it was evident that the Debtor could not operate profitably under the  Agreements, (c) causing the payment of Debtor funds to insiders, including the payment in excess of $130,000,000.00 to Weinstein pursuant to the Weinstein Transfers, and (d) failing to maximize the Debtor's value for its benefit and the benefit of its creditors.

45. The dissipation of Debtor funds authorized by Defendant reduced the assets available to the Debtor and its creditors.

46. The dissipation of Debtor funds authorized by Defendant caused damage to the Debtor and to the Debtor's creditors who did not receive payment on account of obligations due from the Debtor to the Debtor's creditors.

47. The acts and omissions of Defendant were committed in bad faith and demonstrated a faithlessness or lack of true devotion to the interests of the Debtor.

48. The acts, omissions and breaches of duty described herein were in wanton and/or reckless disregard for, and contrary to, the best interests of the Debtor.  As a direct and proximate result of the acts, omissions and breaches of duty alleged herein, the Debtor has been damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Avoidance Of Fraudulent Transfers --

### 11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(1) and 3439.07)

49. The Trustee incorporates herein by this reference paragraphs 1 through 48, inclusive, of this Complaint as if set forth in full herein.

50. The Debtor did not receive reasonably equivalent value in exchange for the Drinkwater Transfers.

51. The Debtor intended to hinder, delay or defraud its creditors by making the Drinkwater Transfers, to Drinkwater's benefit, without consideration to the Debtor.

52. At the time of the Drinkwater Transfers, (a) the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining assets were unreasonably small in relation to such business or transaction, and/or (b) the Debtor intended to incur, or believed or reasonably should have believed that it would incur,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61245649.1

- 14 -

1    debts beyond the Debtor's ability to pay as such debts matured.

2        53.    There exists, and has existed through the Debtor's bankruptcy case, at least one

3    creditor holding an unsecured claim allowable under section 502 of the Bankruptcy Code or that

4    is not allowable by reason of section 502(e) of the Bankruptcy Code who would have the right to

5    avoid, under section 3439.04(a)(1) of the California Civil Code, each of the Drinkwater Transfers.

6        54.    By reason of the foregoing, pursuant to sections 3439.04(a)(1) and 3439.07 of the

7    California Civil Code, as made applicable to this adversary proceeding by section 544(b)(1) of the

8    Bankruptcy Code, the Debtor may avoid the Drinkwater Transfers.

9                            **THIRD CLAIM FOR RELIEF**

10                        **(Avoidance Of Fraudulent Transfers --**

11    **11 U.S.C. § 544(b) and California Civil Code §§ 3439.04(a)(2), 3439.05 and 3439.07)**

12        55.    The Trustee incorporates herein by this reference paragraphs 1 through 48,

13    inclusive, of this Complaint as if set forth in full herein.

14        56.    The Debtor did not reasonably equivalent value in exchange for the Drinkwater

15    Transfers.

16        57.    At the time of the Drinkwater Transfers, (a) the Debtor was engaged in business or

17    a transaction, or was about to engage in business or a transaction, for which its remaining assets

18    were unreasonably small in relation to such business or transaction, and/or (b) the Debtor

19    intended to incur, or believed or reasonably should have believed that it would incur, debts

20    beyond the Debtor's ability to pay as such debts matured.

21        58.    There exists, and has existed through the Debtor's bankruptcy case, at least one

22    creditor holding an unsecured claim allowable under section 502 of the Bankruptcy Code or that

23    is not allowable by reason of section 502(e) of the Bankruptcy Code who would have the right to

24    avoid, under section 3439.04(a)(2) or 3439.05 of the California Civil Code, each of the

25    Drinkwater Transfers.

26        59.    By reason of the foregoing, pursuant to sections 3439.04(a)(2), 3439.05 and

27    3439.07 of the California Civil Code, as made applicable to this adversary proceeding by section

28    544(b)(1) of the Bankruptcy Code, the Debtor may avoid the Drinkwater Transfers.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**FOURTH CLAIM FOR RELIEF**

**(Recovery of Drinkwater Transfers -- 11 U.S.C. §§ 550 and 551)**

60.    The Trustee incorporates herein by this reference paragraphs 1 through 59, inclusive, of this Complaint as if set forth in full herein.

61.    The Drinkwater Transfers are avoidable pursuant to section 544 of the Bankruptcy Code.

62.    To the extent Defendant is not the initial transferee of the Drinkwater Transfers, Drinkwater is the immediate or mediate transferee of the initial transferee of the Drinkwater Transfers.

63.    By reason of the foregoing, the Trustee may recover, for the benefit of the Debtor's estate, the property transferred by the Drinkwater Transfer, or the value of such property, from Defendant pursuant to sections 550(a) and 551 of the Bankruptcy Code.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Trustee prays for judgment as follows:

A.    On the First Claim for Relief, entry of a judgment against Defendant in an amount to be determined at trial.

B.    On the Second and Third Claims for Relief, entry of a judgment against Defendant (i) finding that the Drinkwater Transfers constitute fraudulent transfers and avoiding the Drinkwater Transfers pursuant to 11 U.S.C. § 544(b).

C.    On the Fourth Claim for Relief, entry of judgment against Defendant preserving the property transferred through the Drinkwater Transfers, or the value thereof, for the benefit of the Debtor's estate pursuant to 11 U.S.C. §§ 550 and 551.

D.    On all Claims for Relief, for pre-judgment and post-judgment interest at the highest rate allowed by law, costs of suit incurred herein, and such other and further relief as the Court deems just and proper

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1

DATED:  October  11, 2016                    **ROBINS KAPLAN LLP**

2

3                                            By: /s/ James P. Menton, Jr.
                                                 David B. Shemano
                                                 James P. Menton, Jr.

4

5                                            Special Litigation Counsel for Alfred H. Siegel,
                                             Chapter 7 Trustee

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61245649.1                                   - 17 -

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **October 11, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Lance N Jurich     ljurich@loeb.com, karnote@loeb.com;ladocket@loeb.com
- Benjamin R King     bking@loeb.com, karnote@loeb.com;ladocket@loeb.com
- James P Menton     JPMenton@rkmc.com
- David B Shemano     dshemano@robinskaplan.com
- Alfred H Siegel (TR)     Al.siegel@asiegelandassoc.com,
  Lisa.irving@asiegelandassoc.com;Margo.tzeng@asiegelandassoc.com;asiegel@ecf.epiqsystems.com
- Lindsey L Smith     lls@lnbyb.com, lls@ecf.inforuptcy.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **October 11, 2016** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Judge:**
Hon. Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street, Suite 1482 / Courtroom 1475
Los Angeles, CA 90012

**Attorneys for the Weinstein Company LLC and The Weinstein Company Holdings, LLC**
Alan R. Friedman
Mette H. Kurth
William H. Stassen
Fox Rothschild LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) I served the following
persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service
method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal
delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 11, 2016 | Diana Tehranfar | /s/ Diana Tehranfar |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**